# Exhibit C

```
 1              IN THE MATTER OF THE ARBITRATION
                          OF:
 2
       SUPERIOR COURT OF NEW JERSEY
 3     LAW DIVISION - HUDSON COUNTY
       DOCKET NO. HUD-L-155-53
 4     --------------------------------
       BERNABE CABRERA, individually and
 5     derivatively on behalf of MARINERO
       GRILL, INC.,
 6
                          Plaintiffs,
 7
                                        TRANSCRIPT OF
 8                                      PROCEEDINGS
                     vs.                Volume IV
 9
       ABEL HERNANDEZ and MARINERO GRILL,
10     INC., a New Jersey corporation,

11                          Defendants.
       ------------------------------------
12     ABEL HERNANDEZ,
                          Plaintiff,
13                   vs.

14     BERNABE CABRERA,
                          Defendant.
15     ------------------------------------
       RIVER PLAY, LLC,
16                          Plaintiff,

17                   vs.

18     MARINERO GRILL, INC.,
                          Defendant.
19     ------------------------------------

20                    B E F O R E:
21       Honorable Thomas P. Olivieri, (PJ.Ch) (ret)

22                 Date:  May 5, 2015

23

24     Reported by:
       Celeste A. Galbo, CCR, RMR, RPR
25
```

Celeste Galbo Reporting    - - - -
celestegw@gmail.com

1               TRANSCRIPT of the proceedings in the

2     above-entitled matter, as taken by and before CELESTE

3     A. GALBO, a Certified Court Reporter and Notary

4     Public of the State of New Jersey, held at the

5     offices of Chasan, Leyner & Lamparello, P.C., 300

6     Harmon Meadow Boulevard, Secaucus, New Jersey, on May

7     5, 2015, commencing at 10:10 a.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Celeste Galbo Reporting     -  -  -  -
celestegw@gmail.com

378

```
 1              A P P E A R A N C E S:

 2

 3

 4         DIKTAS & GILLEN, PC
           BY:  CHRISTOS J. DIKTAS, ESQ.
 5              596 Anderson Avenue, Suite 301
                Cliffside Park, New Jersey 07010
 6
           (201) 943-8020
 7
           cdiktas@weblawnj.net
 8
           Attorneys for Bernabe Cabrera
 9

10

11         LAW OFFICES OF GILBERTO M. GARCIA
           BY:  GILBERTO M. GARCIA, ESQ.
12              Court Plaza South
                21 Main Street, Suite 350
13              Hackensack, New Jersey 07601

14         (201) 525-0053

15         gilberto12@aol.com

16         Attorneys for Abel Hernandez

17
      ALSO PRESENT:
18
      Angela B. Shellington, Spanish Interpreter
19    Bernabe Cabrera
      Abel Hernandez
20    Luis Rodriguez
      Joseph Petrucelli
21    Edmond Brown

22

23

24

25
```

1    before Judge Olivieri in Hernandez versus Cabrera,

2    Cabrera versus Hernandez litigation.

3              Can you just tell Judge Olivieri

4    initially by whom were you retained.

5         A.    I was retained by Mr. Cabrera through

6    Mr. Diktas in a capacity to find out what was going

7    on with Marinero Grill.

8         Q.    Okay.  And in that initial appointment

9    when you were working for Mr. Cabrera, what did you

10    do and what did you discover?

11         A.    What we found was there were two sets

12    of books that needed to be reconciled.  There was

13    significant potential of understatement of taxes.  So

14    we were asking to recreate the situation so that we

15    could find out what the potential exposures would be.

16              THE ARBITRATOR:  This will be P-33 for

17    identification.  And the reason we're only marking it

18    for identification is because this is

19    Mr. Petrucelli's certification which we do not

20    normally mark into evidence.  We have Mr. Petrucelli

21    here to testify.  So we will not mark this in

22    evidence, just for identification.  Can we mark it

23    P-33, ID?

24              (Plaintiff's Exhibit 33, Certification

25              of Joseph Petrucelli, CPA in Support of

Petrucelli - Direct                                              426

1           Verified Complaint, was marked for

2           identification.)

3                   THE ARBITRATOR:  Do you have a copy of

4     your certification in front of you?

5                   THE WITNESS:  Yes, they just handed it

6     to me.

7                   THE ARBITRATOR:  You have one?

8                   MR. GARCIA:  Yes.

9                   MR. DIKTAS:  The original date is

10    November 11, 2013.

11                  THE ARBITRATOR:  Okay.

12    BY MR. DIKTAS:

13          Q.      Mr. Petrucelli, I show you what's been

14    marked P-33 for identification.  Have you ever seen

15    that document before?

16          A.      Yes, I have.

17          Q.      Okay.  And it's your certification,

18    isn't it?

19          A.      Yes, it is.

20          Q.      Okay.  And this document was submitted

21    to the court when you were retained by Mr. Cabrera,

22    correct?

23          A.      Yes, it was.

24          Q.      All right.  And in your certification

25    you opine that on or about August 14, 2013 you went

1    to the Marinero Grill, correct?

2          A.    Yes, sir.

3          Q.    Can you tell Judge Olivieri what you

4    found at the site in the Marinero Grill location on

5    August 14, 2013?

6                THE ARBITRATOR:  Okay.  Do you remember

7    apart from looking at P-33 for identification what

8    you observed on that day or do you need that document

9    to refresh your recollection?

10               THE WITNESS:  I mean, I would probably

11   refer -- I mean, I know what we did but I would refer

12   to my certification.

13               THE ARBITRATOR:  That's fine.  So I

14   would ask you if you need it to refresh your

15   recollection, you can read it to yourself and then

16   testify.  Okay?

17               THE WITNESS:  Okay.

18               THE ARBITRATOR:  Thank you.

19               THE WITNESS:  Yes, this refreshes my

20   recollection.

21               THE ARBITRATOR:  Can you tell us then?

22   BY MR. DIKTAS:

23         Q.    Tell us what you observed and what you

24   did on August 14, 2013 at the Marinero Grill.

25         A.    On August 14 we would have gone there

1    and tried to get like any kind of electronic version

2    of a general ledger, the tax returns, restaurants

3    would have payroll records.  So the normal accounting

4    records that would enable us to determine if things

5    like sales tax, payroll taxes, corporate taxes were

6    paid correctly.

7            When we got there the first apparent

8    difference was when we looked at the tax return, it

9    didn't tie to the parent documents that we were

10   given.  There were large disparities.

11       Q.    What does that mean, they didn't tie

12   to?

13       A.    Like you would expect if you have a

14   general ledger it would tie to the tax returns.

15       Q.    Tying is a term of art.  Tell us in

16   layman's terms.

17       A.    Reconciliation would be a better word.

18       Q.    Yes.

19       A.    We like to call it tick and tie, like

20   you tick and tie.  Back in the old days when you used

21   paper you had to make checkmarks and draw a line

22   through it and circle with a cross through it.

23            THE ARBITRATOR:  Thank you.

24       A.    So we proceeded to take the bank

25   records and try to establish the total to gross

1    receipts because we wanted to make sure that what was

2    going through the bank account would in effect match

3    the sales tax reports.

4              We found that there was a disparity and

5    then we began requesting, you know, additional

6    information in an attempt to figure out exactly what

7    wasn't picked up and what should have been picked up.

8         Q.    Picked up you mean as to what?

9         A.    Income.  What income should have been

10   picked up.

11        Q.    Okay.

12        A.    And the appropriate tax be paid.

13        Q.    So what type of records did you find?

14        A.    Actually the bookkeeper, I'm going to

15   call her bookkeeper Nora had actually everything

16   handwritten out.  So when you took the handwritten

17   document and tried to match it to the electronic

18   QuickBooks, there was completely different numbers.

19        Q.    So they had two sets of books?

20        A.    Yes.  So it was in Spanish.  So we had

21   to kinds of work with Nora and have someone who spoke

22   Spanish but we were able to determine what was picked

23   up in the books and what wasn't.

24        Q.    I'm going to show you 34.

25              MR. DIKTAS:  This is 34.

Petrucelli - Direct                                                    430

1                    THE ARBITRATOR:  P-34.

2                    MR. DIKTAS:  You have to identify it.

3                    THE ARBITRATOR:  Are these copies of

4     the ledgers that the witness is referring to?

5                    MR. DIKTAS:  Yes.  There's some

6     attached to the certification but this is for

7     identification.

8                    THE ARBITRATOR:  All right.  These

9     documents attached to Mr. Petrucelli's --

10                   MR. DIKTAS:  They're different.

11                   THE ARBITRATOR:  They're different.

12    Can we mark them as one exhibit or do you need them

13    marked separately?

14                   MR. DIKTAS:  No, they're all the same.

15    It's just a snapshot of the book.  It's not the

16    entire book.

17                   THE ARBITRATOR:  Okay.  All right.  So

18    let's mark it P-34 for identification.

19                   MR. DIKTAS:  It's for reference.

20                   THE ARBITRATOR:  Okay.

21                   (Plaintiff's Exhibit 34, handwritten

22         general ledger of Marinero Grill, was marked

23         for identification.)

24                   THE ARBITRATOR:  Okay, Mr. Garcia,

25    you're being shown P-34 for identification.

1              You have P-34 for identification in

2    front of you Mr. Petrucelli, what is it?  Do you

3    recognize it?

4              THE WITNESS:  Yes, I do.

5              THE ARBITRATOR:  What is it?

6              THE WITNESS:  It's a sample of the

7    types of sheet that I was referring to where -- you

8    know, that we found was not reflected on the tax

9    return of QuickBooks that we were provided or the

10   sales tax reports.

11        Q.    And these are photographic copies of

12   the books that Nora gave you, correct?

13             THE ARBITRATOR:  It's a sample?

14        A.    It's a sampling of -- like every one of

15   these sheets would have receipts behind it.  So like

16   each sheet was almost like its own separate and

17   distinct event.

18             THE ARBITRATOR:  Okay.

19        A.    So we would then look at the sheet,

20   determine the receipts and then try to compare it to

21   the bank statements and the actual books that we were

22   provided.

23             THE ARBITRATOR:  Okay.  Are you

24   offering 34 into evidence?

25             MR. DIKTAS:  Yes.

1                        THE ARBITRATOR:  Do you have any

2      objection?

3                        MR. GARCIA:  None.

4                        THE ARBITRATOR:  Let's mark it, please,

5      in evidence.

6                        (Plaintiff's Exhibit 34, handwritten

7                  general ledger of Marinero Grill, was received

8                  in evidence.)

9                        THE ARBITRATOR:  Thank you, okay.

10     BY MR. DIKTAS:

11             Q.     So, the P-34 in evidence is a sampling

12     second set of books?

13             A.     Yes.

14             Q.     And your testimony is that the second

15     set of books did not correlate to the QuickBooks,

16     correct?

17             A.     At the time --

18             Q.     All we're talking about is August of

19     '13.

20             A.     Out of August, yes.

21             Q.     Okay.  And did you have an opportunity

22     to address corporate records tracing back to the

23     QuickBooks and the handwritten books, P-34?

24             A.     Since -- well, at the time the sales

25     for some reason when we tried to capture the

1    electronic sales, the old data had been purged and we

2    were unable to retrieve the actual sales data post

3    the '13.  Typically in a retail restaurant they have

4    all their food, all their liquor on a computer and

5    we're able to get what we call through a point of

6    sale system.

7          Q.    Correct.

8          A.    For some reason the older system like

9    '12 had been purged for some reason, so we had --

10          Q.    Purged means deleted?

11          A.    Normally purged in our world means just

12    you take the data and condense it so like you know

13    you can like close out a period and move forward.  In

14    our case purged meant we couldn't get it.  So but

15    normally a purge is done so that you close out one

16    year and you restart the new year.  But you're still

17    able to go back --

18          Q.    And reference it?

19          A.    -- and reference it.  That wasn't the

20    case.  That was one of the reasons we had to go back

21    and start pulling bank records where we created

22    through these sheets.  That's why it was a little bit

23    burdensome in the beginning.

24          Q.    Okay.  And you said we had to go back

25    and create.  Did you have to retain special experts

Petrucelli - Direct                                    434

1   to go through the computers?

2        A.     Yeah.  We always to make sure that

3   nobody can accuse us of ever tampering with the

4   computers, we insist on what we call a digital copy

5   and we take an exact copy of their hard drive at that

6   date so that we're working with our hard drive.

7   We're physically not touching theirs because we've

8   been accused of, oh, you could have done it.  So it's

9   a specific protocol you do and that is that you go

10  in --

11       Q.     You or a company?

12       A.     A company, special company that keeps a

13  chain of custody verifies and certifies that I've not

14  altered it, I'm working with a totally separate

15  drive.

16       Q.     After you retained the company and you

17  had an additional image of the prior history, what

18  did you find?

19       A.     We were able to find -- we were able to

20  capture some data which we were able to then kind of

21  roll forward and get a level of comfortability that

22  going forward we had captured the correct numbers

23  that should be reported, and immediately worked with

24  everybody in mitigating the potential tax purposes --

25  we basically stopped the intent because we corrected

Celeste Galbo Reporting     - - - -
celestegw@gmail.com

1    it as of the date and then we would go back.  But

2    from the point where we identified, you know, that

3    the sales or some reasons the sales of the point of

4    system were not matching, we came up with a manual

5    way of making sure that sales were the sales from

6    that point on and then we'd have to go back through

7    bank records, through the sheets and physical

8    document trying to establish what happened I think

9    back to 2010 if I'm correct.

10         Q.     So you attempted to address the

11   discrepancies of the two sets of books and the amount

12   recorded and submitted to the State of New Jersey and

13   the federal government, correct?

14         A.     Correct.

15         Q.     And you said something about protecting

16   by going in to protect whom?

17         A.     My client at that time, Mr. Cabrera, my

18   first and foremost position was to mitigate any

19   potential tax exposure at that time because I was Mr.

20   Cabrera's expert.

21         Q.     And tell the judge what happens to

22   shareholders or partners or certificate holders of an

23   LLC when the taxes aren't paid, the liability that

24   the government assesses?

25              MR. GARCIA:  Can you instead ask him

Petrucelli - Direct                                         436

```
 1   what would have happened here or what was his concern
 2   rather than in a general sense?  It's a matter --
 3              MR. DIKTAS:  I just want to ask him --
 4              THE ARBITRATOR:  I'll allow the
 5   question.  Go ahead.
 6              MR. DIKTAS:  Told generically then
 7   we'll go into --
 8         A.    The biggest issue is any time you have
 9   a sales tax or payroll tax, there could be called
10   trust fund potential penalties that could be imposed
11   on any shareholder and it's a responsible party.  So
12   they call him a nominee.
13              So in this case Mr. Cabrera being a 50
14   percent owner would have been exposed to paying these
15   personally if the corporation didn't.  So it's like
16   it actually pierces the corporate veil and goes to an
17   individual.  So we wanted to make sure that we
18   understood what that liability was so that they
19   wouldn't assess the harshest penalties.  Because
20   there's all kind of fraud penalties.  With us in a
21   position of mitigating before we have been contacted
22   by the IRS or a state authority, we would be in the
23   position later on to reroute penalties or further
24   mitigate the potential exposure to Mr. Cabrera.
25         Q.    That's Mr. Cabrera?
```

Petrucelli - Direct                                             437

1          A.      Yes.

2          Q.      That's because he was not the

3     controlling shareholder or the reporting shareholder?

4          A.      He was not the reporting shareholder.

5          Q.      Okay.  In your certification there's a

6     tab called Exhibit 3.

7          A.      Exhibit 3, yes.

8          Q.      Can you -- have you seen that document

9     before?

10         A.      Yes, I have.

11         Q.      Can you read it for a minute and

12    refresh your recollection?

13         A.      Yes.

14         Q.      Okay.  Can you explain to Judge

15    Olivieri what that document is and why it was

16    included in your certification to the court?

17         A.      That -- after we went back and

18    recreated the books, we then compared it to the ST 50

19    which is actually the sales tax report that gets

20    filed.  And we found these discrepancies between the

21    years '11, '12 and '13.

22         Q.      Read it into the record.  So '11, what

23    do the books state?

24         A.      The books, well, the actually ST 50

25    that was filed reflected 631,448.

Petrucelli - Direct                                           438

1          Q.      Does that mean sales?  What does that

2    mean?

3          A.      Sales.

4          Q.      So in 2011, reported to the State of

5    New Jersey and the federal government, both?

6          A.      No, this is the State of New Jersey.

7    We're talking about sales tax.

8          Q.      State of New Jersey, sales tax.  So

9    sales tax was collected on $631,448, correct?

10         A.      Right.

11         Q.      And what was the actual number of sales

12   generated by Mr. Hernandez?

13         A.      We found 919,096 for a difference of

14   287,648.

15         Q.      So that means seven percent sales tax

16   was not tendered on sales of $287,648, correct?

17         A.      Presuming sometime there may be some

18   sales tax but I would doubt it but yes.

19         Q.      In 2012 what did the declared amount of

20   sales, what were they?

21         A.      The declared amount was 645,365.

22         Q.      Okay.  And what were the book sales on

23   the second set of books?

24         A.      1,016.128.

25         Q.      So what's the differential that was not

1    reported to the State of New Jersey?

2        A.    370,763.

3        Q.    And 2013, you have a footnote there?

4        A.    2013, we only had the first and second

5    quarter data at that time.

6        Q.    And what did the first and second

7    quarter date two reveal?

8        A.    It revealed that there was $299,998

9    dollars reported on the sales tax return and the

10   books showed 490,736 for a difference of 190,838.

11       Q.    And what's the total differential that

12   was not reported to the State of New Jersey?

13       A.    849,248.

14       Q.    849,248.  In your experience as an

15   accountant as a auditor of forensic accounting, where

16   did that money go?  What can you presume?

17       A.    There was legitimate expenses that were

18   paid.  Because the second set of books did have

19   receipts for like cash payments to purchase stuff and

20   what they call payroll.  So there were some expenses

21   that would have offset it but I'm not sure -- I can't

22   tell you I could reconcile all 849, but there was

23   some expenses.

24       Q.    Okay.  You then addressed issues with

25   the employees.  What is your recollection of the

Petrucelli - Direct                                    440

1    employees?

2          A.      That to me was more my concern because

3    if the government comes in, they know that you need

4    more than one person or two persons to run a

5    restaurant.  So there were not enough people on

6    payroll and a lot of them were paid on those sheets

7    that you had showed me earlier in this exhibit, some

8    of these are for --

9          Q.      This exhibit is P-34.

10         A.      P-34, some of these are like for paying

11   people --

12         Q.      Cash?

13         A.      -- cash.  And then they somehow got the

14   payroll to the accountant who would generate it but

15   it wouldn't reflect all the payroll --

16         Q.      Okay.

17         A.      -- for all the people.

18         Q.      So it's your testimony that you

19   determined that the -- there was an under declaration

20   of employees working at the restaurant by Marinero

21   Grill under Mr. Hernandez's control?

22         A.      There were people that were being paid

23   that were not reflected on the payroll tax.

24         Q.      And what are the penalties for that

25   occurrence?

          Celeste Galbo Reporting    - - - -
celestegw@gmail.com

1          A.      You have a couple.  There's a couple of

2     penalties.  You can have the state come in and deem

3     all the people that you're paying are subject to

4     unemployment.  You have potential state unemployment

5     taxes.  You have the state income taxes as well as

6     the IRS coming and imposing Social Security taxes and

7     federal withholding taxes.  When you're an employer

8     and you didn't withhold taxes, you become responsible

9     for some of those taxes.  So it was probably --

10         Q.      Stop for a minute.  The employer

11    becoming responsible for some of those taxes, are you

12    talking about that the employer would be responsible

13    to pay the deductions of the employees that were not

14    put on the books?

15         A.      Some of the withholding, yeah, the IRS

16    will come in because you're responsible to get a

17    W-9 -- I mean W-4 filled out and your I-9 and all

18    those forms.  So if you didn't properly withhold,

19    they could come back and say that you should have

20    withhold and force you to pay some of it.  Not all of

21    it.  But there's much -- there's also the issue of

22    workman's comp that could have came up, that the

23    state agencies would find out that you didn't have

24    these people on workman's comp policy.  I've seen

25    them fine clients $20,000 because you didn't these

Celeste Galbo Reporting      - - - -
celestegw@gmail.com

Petrucelli - Direct                                      442

1    workman's comp covering all your employees.  So it

2    was one of the areas I wanted to get quickly resolved

3    which I believe we did right away.

4          Q.    On November 11 when you signed the

5    certification what was your opinion, what did you

6    understand from your initial review that occurred?

7          A.    Can you say that question one more

8    time?

9          Q.    Sure.  On November 8th -- I'm sorry,

10   November 11, 2013 when you signed this document, you

11   had a professional opinion.  With a reasonable degree

12   of accounting certainty based on up until this date,

13   not after, up until this date while you were still

14   working for Mr. Cabrera, what was your opinion within

15   a reasonable degree of accounting certainty?

16         A.    That there was understatement of income

17   and mismanagement as regards to paying the proper

18   taxes.  And there was a trust fund penalties and

19   potential exposure for my client, Mr. Cabrera, at

20   that time.

21         Q.    Can you read paragraph 8 of your

22   certification?

23         A.    Based upon on a --

24         Q.    To yourself.

25               THE ARBITRATOR:  No, to yourself.

Petrucelli - Direct                                        443

1                          (Witness complies.)

2          A.      Okay.

3          Q.      Do you want to add to your statement as

4    to your opinion -- all we're talking about is a

5    snapshot.

6          A.      Okay.

7          Q.      What you did up until November 11,

8    2013, not after that, up until that point.

9          A.      That there was a concealment of

10   earnings in the business operations structured in a

11   fashion that would have supported that purpose.

12   Meaning by having a second set of books you were

13   structuring the books to conceal earnings.

14         Q.      Okay.  Subsequent to November you

15   were -- you took on a new role, correct?

16         A.      Yes.

17         Q.      Okay.  So now we're going to talk about

18   your role after November.  So these are the positions

19   that you've taken on behalf of first the court for

20   Judge Velazquez and then segue through Judge Olivieri

21   as the mediator and then as the arbitrator.  So

22   you're in a new role?

23         A.      Yes.

24         Q.      Even though you're getting paid half

25   from Marinero Grill which we'll talk about in a

Celeste Galbo Reporting      - - - -
celestegw@gmail.com

1   while, but you are now loyal, you're independent to

2   the court and to the arbitrator?

3        A.    Yes.

4              THE ARBITRATOR:  What was the date,

5   again?

6              THE WITNESS:  I believe it was January.

7   January 9th I think was the first time, I think.

8              THE ARBITRATOR:  Of what year?

9              MR. DIKTAS:  Well, we know from P-24,

10  your Honor, on January 9th, the letter that

11  Mr. Petrucelli writes to Mr. Garcia says I am the

12  court appointed monitor.  So it would have to be from

13  January 9 prospectively.

14             THE ARBITRATOR:  Of what year?

15             MR. DIKTAS:  '14.  I'm sorry.

16             MR. GARCIA:  You know, your Honor, if

17  it may help, it was December 13, it was during the

18  return date before Judge Velazquez by consent we

19  agreed that --

20             THE ARBITRATOR:  After December 13 of

21  '13?

22             MR. DIKTAS:  On or about that date is

23  fine, sir.  I don't have that part of the file with

24  me.

25             MR. GARCIA:  There was a consent order.

1              THE WITNESS:  It was the date whenever

2     the return date was, then we met in the courtroom.

3              MR. DIKTAS:  And then we agreed

4     consensually that Mr. Petrucelli would become a

5     monitor.

6     BY MR. DIKTAS:

7         Q.    I show you what's been marked P-24 in

8     evidence.  Can you identify that document?

9         A.    Yes, it's what I would term a letter

10    report.  I was reporting back in -- in the

11    prospective of being a monitor what I still needed.

12        Q.    So take a minute, refresh your

13    recollection.  Then I'll ask you some questions.

14        A.    Okay.

15        Q.    So on January 9, 2014 as a court

16    appointed monitor you write to Mr. Garcia, correct?

17        A.    Yes.

18        Q.    And he's to your right, correct?

19        A.    Yes.

20        Q.    And he's Mr. Hernandez's attorney?

21        A.    Yes.

22        Q.    What did you ask of Mr. Garcia?

23        A.    I asked him if he could assist us in

24    getting -- because we had gone to the location and we

25    were trying to get missing bank statements and

1    whatever information was missing so that I could

2    start to help in identifying at that time Judge

3    Velazquez's order I believe was to determine what was

4    the tax exposure and to mitigate and basically

5    preserve the entity.  So this would have been bank

6    statements that we were missing.  We specifically say

7    here is the bank accounts and here's what was

8    missing.

9         Q.    So you basically asked Mr. Garcia to

10   have his client's bookkeeper compile records for you,

11   correct?

12        A.    Yes.

13        Q.    Did you get those records?

14        A.    Yes, I did eventually, yeah.

15        Q.    Okay.  And now I direct your attention

16   to P-25.

17        A.    Okay.

18        Q.    Have you ever seen that document

19   before?

20        A.    Yes.

21        Q.    Why don't you take a minute to review

22   it before I ask you some questions because it's quite

23   extensive.

24              (Pause in the proceedings.)

25              MR. DIKTAS:  P-25 is a letter January

1   31st.

2           A.      Okay.

3           Q.      This is a report to Judge Velazquez,

4   correct?

5           A.      Yes.

6           Q.      And you signed it on page 8, correct?

7   That's your signature?

8           A.      Yes.

9           Q.      Please tell us, don't read, tell us

10  what you reported to Judge Velazquez on January 31st,

11  2014?

12          MR. GARCIA:   It's in evidence.  He can

13  read it if he wants.

14          THE ARBITRATOR:   It's in evidence.

15  You're absolutely right.

16          Q.      You want to read, all right.  On page 1

17  there's a box graph, correct?

18          A.      Yes.

19          Q.      All right.  Read into the record points

20  one through five and give us -- and tell us what that

21  means.

22          A.      Okay.  The unreported sales tax

23  liability was for the period 2010 to 2013.  We were

24  earlier talking about the income that wasn't

25  reflected which would have in our estimate result in

Celeste Galbo Reporting      - - - -
celestegw@gmail.com

1    a $79,200 sales tax liability.

2              Then we went on to the payroll tax

3    liabilities for 2012-2013 that was unreported and

4    determined that liability to be $55,695.  We also

5    then had to go and recalculate the corporate income

6    tax liability for the period 2010 to 2013 which was

7    $181,165.

8              We then realized that the unreported --

9    there was also an issue as to the unreported personal

10   income tax liability because there was money being

11   taken out that would be in a corporate environment

12   not only do you pay tax at the corporate level if you

13   take distributions out, you would have to pay tax at

14   the individual level as well.  So we came up with

15   what we believed was the total estimated liability

16   between from 2010 through 2013 to be $383,508.

17             We then went on based on our experience

18   to estimate what were the potential penalties,

19   interest and liabilities at that time.  We found that

20   to be $139,990 for a grand total of $523,498.

21             The report pretty much --

22        Q.    Stop.  So then you advised Judge

23   Velazquez that as of January 31, 2014 there is an

24   outstanding tax penalties and interest liability of

25   Marinero Grill due to the failure to report or

1    unreporting of sales tax, payroll and corporate

2    income in the amount of $523,498?

3         A.    Yes.

4         Q.    And at that time Marinero Grill was

5    under the control of Mr. Hernandez?

6         A.    Yes.

7         Q.    He still is, right?

8         A.    Yes.

9         Q.    Page 3 of the report.

10        A.    Yes.

11        Q.    There's a summary table Sales Tax

12   Liability, correct?

13        A.    Yes.

14        Q.    So what did you tell Judge Velazquez on

15   January 31st, 2014 of the sales tax liability?

16        A.    That based on the income discrepancy of

17   $1,131,430 that at 7 percent tax rate would be

18   $79,200 sales tax due for the period 2010 through

19   2013.

20        Q.    But as of this date you determined that

21   $1,131,430 was not accounted by Mr. Hernandez in the

22   corporate records, correct?

23        A.    For the New Jersey sales tax, yes.

24        Q.    Do you know where that money went?

25        A.    Not all of it.

1          Q.      Page 4, Table B, Payroll Tax Liability.

2   What did you tell the judge about that?

3          A.      Again, we weren't provided '10 and '11,

4   so we worked with what we had, but we were provided

5   ledgers that indicated there were in 2012 there was

6   $295,587 of potential wages that we only found

7   $191,890 of it reported on the 941 which is the

8   federal Social Security tax return and remittance of

9   federal withholding tax.  So we then found a

10  difference and then we came up with, you know, what

11  the ultimate tax rate would be based on Social

12  Security, federal unemployment tax, FUTA.  So we

13  estimated the tax liability based on '12 and '13.

14          Also why we became less concerned is

15  the statute of limitations is only three years on the

16  federal.  On the state was four years at the time.

17  So we, you know, we kind of said probably '11 would

18  fall off and they probably wouldn't be able to

19  assess, so that's why we went with '12 and '13

20  because those were clearly within the statute.

21          Q.      And you determined on January 31st,

22  2014 that there was unreported 941 taxes to the

23  federal government of income of $287, 977, correct?

24          A.      Right.  And then like I said the tax

25  rate is a combination of the FICA, FUTA and state

1    unemployment.  So there's a federal unemployment and

2    state unemployment.  So we did our best to calculate

3    what we believed the rate would be at that time.

4         Q.    Okay.  And on page 4 the lower box

5    shows how you calculated that 19.34 percent, correct?

6         A.    Yes.

7         Q.    On page 5, you have a corporate income

8    tax liability, correct?

9         A.    Yes.

10        Q.    Tell us about that.

11        A.    Basically we were showing how we

12   arrived at what would have been had all the income

13   that was represented that -- books, that second set

14   of books that was provided to us, what in fact the

15   proper taxable income that should have been reported

16   on the 1120 corporate tax return, federal corporate

17   tax return.  We found that the federal tax

18   liabilities from 2010 to 2012 to be 142,842 and with

19   that there's also a state imposed corporate tax for

20   that same period of time would have been 38,323 for a

21   total corporate income tax exposure of 181,165.

22        Q.    Those taxes were never paid, right?

23        A.    No.

24        Q.    But the income was generated, correct?

25        A.    Yes, the income was generated.

Petrucelli - Direct                                              452

1          Q.     On the same page 5 there's a summary

2    table for the federal income tax liability.  You want

3    to go through that?

4          A.     Yeah.  The first column would show you

5    what was reported on the federal 1120 tax return.

6    Then we showed what we wound up with when we took all

7    the sheets and regenerated the general ledger, what

8    the taxable income would be.  In 2010 it went from a

9    negative 117 to -- 036 to a of positive 45,370 --

10         Q.     So that's almost $163,000 shift,

11   correct?

12         A.     Correct.

13         Q.     Were there were taxes missing in that

14   amount?

15         A.     Correct.

16         Q.     Okay.  Please go ahead.

17         A.     And then we would -- then we actually

18   ran it through a 1120 based on those revised numbers

19   and found an adjusted tax liability of 6,806.

20                Then the second year it went from

21   negative 19,785 to a taxable income of 249,582 which

22   resulted in an estimated tax liability of 80,587.

23         Q.     Hold up for a minute.  So we have

24   Mr. Hernandez through his accountants presented to

25   the federal government that the taxable income per

Petrucelli - Direct                                              453

1        1120 forms in 2011 was negative 19,785, correct?

2            A.       Correct.

3            Q.       Your calculations as a court monitor

4    determined that was really $249,582, correct?

5            A.       Correct.

6            Q.       That's a 200 and basically 68 rounded

7    differential of unreported tax, correct?

8            A.       Taxable income.

9                     THE ARBITRATOR:   Unreported income.

10           A.       That led to additional taxes of 80,000.

11                    THE ARBITRATOR:   80,587.

12                    MR. DIKTAS:   Right.

13           Q.       In 2012 what happened?

14           A.       2012 it was a negative 41,726.   That

15   was listed on the 1120 as taxable income.   When we

16   made the adjustments, we wound up with taxable income

17   of $185,127 and additional adjusted tax liability of

18   $55,449.

19           Q.       So we have the same situation, that we

20   have a reporting by Mr. Hernandez through Mr. Barquin

21   on Form 1120 negative $41,726 when in reality the

22   adjustable taxable income was 185,127.   So that's a

23   swing of approximately $231,000 of taxable income not

24   reported, correct?

25           A.       Approximately.

Petrucelli - Direct                                                    454

1          Q.      On page 6 of the report, what does that

2    tell us?

3          A.      That's our re-creation of the 1120s and

4    how we came up with the tax liability.  So we show

5    the adjustments to sales, the additional sales tax

6    would be credited.  We found some additional payroll

7    expenses, so we basically tried to reestablish had

8    the books and records been done this way, what the

9    ultimate tax exposure would be.  So it's an actual

10   reconciliation.

11                 So not only do we find sales, we also

12   found expenses and that we gave credit for those

13   payroll tax expenses and what the payroll tax

14   additional would do, they would ultimately reduce the

15   tax liability, so we accounted for those.

16         Q.      Still there was -- even after your

17   reconciliation there was a shortfall of income tax,

18   federal income tax paid in the amount of $142,842?

19         A.      Yes.

20         Q.      Page 7.  You have Table D.  What is

21   that?

22         A.      That would reflect the exposure that

23   would transfer to the personal income taxes of the

24   shareholders based on what we found based on the

25   books and records.  So it was in 2010 there was

1    additional income of $38,569.  Because what would

2    happen is you pay people labor, so they're going to

3    take it as a distribution because you didn't pay it.

4    So you would -- that's the unfortunate thing about a

5    corporation, you get a double hit.  They're going to

6    look at it that you took the cash out even though you

7    paid someone.  So you have to be careful when you

8    pull money out of a corporation because it's a double

9    edge sword.  So this would reflect the personal

10    income tax exposure to the shareholders.

11         Q.      So the totals for 2010, 2011 and 2012,

12    how much would Mr. Cabrera and Mr. Hernandez be

13    liable for, potentially liable for based on the

14    actions of Mr. Hernandez and his accounting

15    irregularities?

16         A.      67,448, so half of that would be

17    approximately 33,000.

18         Q.      33,000 and change?

19         A.      33,000 and change.

20         Q.      Let's talk about the penalties.

21         A.      No, you were asking me about the

22    personal income tax?

23         Q.      So there each would be approximately

24    $33,000?

25         A.      Yes.  And, again, that's a low -- I

Celeste Galbo Reporting    - - - -
celestegw@gmail.com

1    wasn't privied to -- I'm just using a tax rate of 20

2    percent.

3            Q.    Based on --

4            A.    Based on this, yes.

5            Q.    -- on this report of January 21st,

6    2014, this is what you projected?

7            A.    Yes.

8            Q.    What about Table E?

9            A.    Table E is taking the IRS and New

10   Jersey regs and applying the appropriate penalties

11   based on our experience and also calculating the

12   interest rate which is readily available, and trying

13   to come up with based on the -- if these returns were

14   filed, these are the types of penalties we'd wind up

15   incurring.  We estimated them to be $139,990.

16           Q.    And that's divided in half?

17           A.    Divided in half, correct.

18           Q.    So they would be basically 70,000

19   approximately based on this snapshot, 70,000 each?

20           A.    Yes, for penalties and interest.

21           Q.    And 32,000 above.  So on this page 7

22   you have approximate exposure to Mr. Cabrera of

23   100,000 plus or minus a couple thousand?

24           A.    Correct.

25           Q.    Based on these figures?

1          A.      Yes, at that time.

2          Q.      At that time.  Thank you.

3                  What was your summary conclusion to

4     Judge Velazquez?

5          A.      That we needed to do further analysis

6     and continue to work toward mitigating the tax

7     exposure.

8          Q.      Because of the variances, correct?

9          A.      Because of the variances, correct.

10                 MR. GARCIA:  Can I request a little

11    break now?

12                 THE ARBITRATOR:  Of course.  Yes.  It's

13    12:15.  12:30.

14                 MR. GARCIA:  Ten minutes is fine.

15                 THE ARBITRATOR:  Let's take 10.

16                 MR. GARCIA:  Thank you, judge.

17    Appreciate it.

18                 THE ARBITRATOR:  Any time.  12:25.

19                 (Recess taken.)

20                 THE ARBITRATOR:  Okay.  Mr. Petrucelli,

21    you're still under oath.

22                 THE WITNESS:  Yes, sir.

23    BY MR. DIKTAS:

24         Q.      All right.  Back on the record.

25                 Mr. Petrucelli, I direct your attention

Petrucelli - Direct                                              458

 1    to P-26 in evidence.

 2            A.      Yes.

 3            Q.      The March 3rd transmittal.  Do you

 4    recognize this letter?

 5            A.      Yes, I do.

 6            Q.      Is that your signature on the bottom?

 7            A.      Yes.

 8            Q.      This is a interim report to Judge

 9    Velazquez?

10            A.      Yes.

11            Q.      Okay.  What did you tell Judge

12    Velazquez in this letter and what is the spreadsheets

13    on the back?

14            A.      This is where I have -- we engaged a

15    forensic person that specializes in electronic and

16    when we tried to recover --

17            Q.      Electronic what?

18            A.      Data.

19            Q.      Okay.  So this is the report from the

20    gentleman of the company that you retained that you

21    testified earlier to as to the snapshot of the hard

22    drive?

23            A.      Yes, this is what we were able to

24    recover --

25            Q.      Okay.

1          A.      -- from the hard drive.

2          Q.      Continue.

3          A.      And then, this was in the system by the

4    name of Aldelo POS.  And like I said, this is when we

5    first found out there was some deleted database

6    storages and we couldn't go back which made it a

7    little more difficult to try to recreate '11 and '12.

8    So this is the first time we realized there was

9    missing what we call point of sale data.

10         Q.      Did you find it?  Is it attached?

11         A.      No, we never found it.  We had to go

12   back and recreate.

13         Q.      To the best of your ability?

14         A.      To the best of our ability.

15         Q.      So the computers were wiped for lack of

16   a better term for those years?

17         A.      Again, I would not want to speculate.

18   I know that we couldn't access them and Aldelo

19   claimed that there was some kind of proprietary

20   format which I didn't understand but he was supposed

21   to try to break it because there seemed like there

22   was some kind of coding in it but we never --

23         Q.      You never could get the data?

24         A.      We never could get the data.

25         Q.      And you through the court appointed sub

Petrucelli - Direct                                    460

1    experts could not get the data, correct?

2         A.    No.

3         Q.    I direct your attention to P-27 in

4    evidence.

5         A.    Yes.

6         Q.    On the last page of P-27, is that your

7    signature?

8         A.    Yes, it is.

9         Q.    And this is another interim report to

10   Judge Velazquez?

11        A.    Yeah.  Once I became the monitor I

12   would go in periodically and update.  And if you go

13   to our findings on page 2, you can see where we're

14   now almost reconciled to the sales tax and the

15   potential liability was only like $500 but we were

16   working with Nora and Marinero Grill trying to

17   reconcile the point of sale system to the bank

18   statements and everything.  And you can see we were

19   starting to get much closer than we had previously

20   been.

21        Q.    Okay.

22        A.    And we also I think at that time was

23   when we were compelling Aldelo to get us supposedly

24   the database but we never got it.

25        Q.    Okay.  On page 4, the before and after

Petrucelli - Direct                                        461

1    analysis.

2          A.      Okay.

3          Q.      The little box, January-February 2013

4    versus January-February '14.  What does that tell us?

5          A.      It shows us that we're starting to

6    get -- you know, where there was any differences.

7    You can see like we only had 73,000 in deposits

8    before, now we have 155.  So since we were there, you

9    can see the increase in the revenue as us being

10   there.

11         Q.      So since you took over as the court

12   appointed monitor, business got better, business was

13   all accounted for?

14                 THE ARBITRATOR:  The reporting got

15   better.

16                 THE WITNESS:  The reporting got better.

17                 MR. DIKTAS:  The reporting got better.

18   Thank you.

19         Q.      The reporting, is that a yes?

20         A.      That's a fair statement.

21         Q.      Then I direct your attention to P-28

22   and page 3.  That's your signature?  It's the April

23   14 correspondence?

24         A.      Yes, yes.

25         Q.      This is another report to Judge

1    Velazquez, correct?

2         A.    Yes, just reiterating that these items

3    still remained unresolved.

4         Q.    And what are these items?

5         A.    Sales tax, payroll taxes, corporate

6    taxes.  This is when I was working with Baroquin to

7    try to get the amended returns corrected and so forth

8    to try to mitigate it.  So this was just reminding

9    that, Judge, it's April and I still don't have

10   resolution to this, some of the more pressing taxes

11   issues.

12        Q.    And what are the sales tax issues on

13   April 14, 2014?

14        A.    79,200 of tax liability.

15        Q.    And payroll?  This is -- every question

16   I'm asking you is as of April 14, 2014, approximately

17   a year ago.  Payroll tax liability?

18        A.    Yeah, still remained at the 55,695.

19        Q.    Corporate tax liability?

20        A.    The 181,165.

21        Q.    Personal income tax liability?

22        A.    67,448.

23        Q.    Penalties and interest?

24        A.    139,990.

25        Q.    Collection of rents?

Petrucelli - Direct                                          463

1          A.      We, you know, we weren't provided any

2    information --

3          Q.      Okay.

4          A.      -- as to the rents that were being

5    paid.  I believe there is a tenant paying, so we had

6    requested those records at that time to try to see

7    what that impact would be.

8                  THE ARBITRATOR:  So you had stabilized

9    the situation but there were still these liabilities

10   that were there before you became the court monitor?

11                 THE WITNESS:  Stabilized is a very good

12   word.  We had fixed it to the point where, you know,

13   we had a handle on where we were at and we were

14   controlling it at that point.  The only -- like

15   things would come up with the rents and stuff like

16   that because there was something about the collection

17   of the rents and how those were being treated that I

18   didn't have the information.  So I just wanted to

19   make sure that there was no other further -- because

20   technically if one entity is paying taxes on another

21   entity it's an expense on that entity, but then that

22   entity that the taxes was paid for would become

23   income.

24                 THE ARBITRATOR:  Yeah.

25                 THE WITNESS:  So you want to make sure

Petrucelli - Direct                                    464

 1    that it was both sides of the --

 2                    THE ARBITRATOR:  I understand.

 3         Q.    On your signature page there's a

 4    statement to Judge Velazquez.  What is your position

 5    as to prior tax records and potential liability?

 6                    THE ARBITRATOR:  I'm sorry, are we

 7    still on 28?

 8                    MR. DIKTAS:  Yes.

 9         Q.    The last page above your signature you

10    make a statement to the judge about prior tax year,

11    the additional tax records and access to documents.

12    What is your position as of a year ago?

13         A.    That we still need further access to,

14    you know, prior year's records in order to make sure

15    because at that point we had done the best to

16    recreate and estimate that we could.

17         Q.    Okay.  And I direct you to P-29.  And

18    the last page of P-29, is that your signature?

19         A.    Yes.

20         Q.    And this is your July 21st, 2014 report

21    to Judge Velazquez, correct?

22         A.    Correct.

23         Q.    All right.  The beginning or the first

24    page is a recitation of prior fact?

25         A.    Yes.

Petrucelli - Direct                                              465

1        Q.      Then you go into the Baroquin report,

2   correct?

3        A.      Correct.

4        Q.      Tell us about the Baroquin report.

5        A.      You know, the overall methodology was

6   using because we had talked --

7        Q.      "He" being Baroquin, Mario Barquin, the

8   corporate accountant?

9        A.      Yes, he's the corporate accountant.

10       Q.      Okay, go ahead.

11               MR. GARCIA:  I'm sorry, corporate

12  accountant for Marinero Grill?

13               MR. DIKTAS:  For Marinero Grill?

14               THE WITNESS:  Yes, he's the accountant.

15       A.      So his report that he presented was

16  satisfactory because, like I said, we had been giving

17  him our findings and working with him.  There still

18  was some concerns, you know, because, you know, the

19  question was, you know, how come these transactions

20  weren't being reported?  Because there was always

21  told it was given to him.  So I would say You're the

22  CPA, how come you're not -- because I'm speaking to

23  someone that doesn't speak English very well and he

24  keeps telling me to speak to you.  So I was kind of

25  like why isn't this being picked up, why aren't you

Petrucelli - Direct                                              466

1   explaining to your client?  You know, I spoke to you,

2   you know, whenever I started.  I mean, we're still

3   asking you to do this, you should be doing this

4   without me asking you.  So, you know, he should have

5   at least been instructing him on to the potential tax

6   exposure.

7                     THE ARBITRATOR:  Him meaning Hernandez,

8   Mr. Hernandez?

9                     THE WITNESS:  No, Mr. Hernandez should

10  have been instructed by Mr. Barquin, you know, that

11  on procedures.  Because he was also, I believe,

12  handling the payroll.  They would give him the

13  information and Mr. Barquin would generate the

14  payroll reports.  So, you know, I wanted to make sure

15  that we had a good set of books and records that if

16  the IRS came in when I was involved, everything was

17  Is were dotted and Ts were crossed so that I could

18  show that there was mitigation going on.

19                     So, you know, he did start to follow

20  our lead and you'll see it as we start going further

21  to the next reports but --

22            Q.    The last paragraph, Baroquin indicates

23  sales and taxes of $172,718.92 for 2011, '12 and '13,

24  correct?

25            A.    Yes.

Celeste Galbo Reporting      - - - -
celestegw@gmail.com

1          Q.     And then you underline a statement to

2     the judge.  What does that mean?

3          A.     That 2010 we're still exposed at the

4     time and was not included in his report.

5          Q.     Okay.  Page 3 is --

6          A.     Again is showing --

7          Q.     -- some is the overview --

8          A.     This is new.  So what we're going to

9     show now is that they started to be accurate.

10    Meaning that we were finding the deposits matching

11    the actual sales tax reports.

12         Q.     Okay.  So then on July 21st, 2014 after

13    your involvement we see for the first time books,

14    records and tax returns being synchrony as to the

15    amount of money incurred, generated gross amounts of

16    taxes due and owing?

17         A.     Yes, what was on the cash ledger now

18    matched the ST 51 sales tax return file.

19         Q.     On page 4 you have a payroll tax

20    liability.  What's that about?

21         A.     We started reconciling, you know, and

22    could see that they were now including the people

23    that were listed on the sheet and were being picked

24    up on the 941s.

25         Q.     So everybody is basically in English is

Petrucelli - Direct                                              468

1    being paid on the books?

2         A.    Yeah.  Any off book treatment was no

3    longer being performed, they were being put on the

4    books.

5         Q.    Okay.  And in May and June of 2014 the

6    payroll tax liability is -- meets the obligation of

7    the employer?

8         A.    Correct, the 941 now matched the books.

9         Q.    You have various bar graphs showing

10   that the sales have increased?

11        A.    Yes.

12        Q.    I shouldn't say that the sales have

13   increased.  That the reported sales have increased?

14        A.    The reported sales have increased, yes.

15        Q.    And on page 6 you show a bar graph of

16   sales and deposits.  And you show that over --

17   between 2013 and 2014 for the months of April and May

18   that the sales and deposits have increased

19   significantly, correct?

20        A.    Two things happened here.  For the

21   first time we were now able to match the sales and we

22   had a point of sale system that worked.  So the sales

23   increased.  So we took the 2013 sales number, we

24   could look at it now with point of sales data that we

25   had.  So that increased 26,000 as well as the

Celeste Galbo Reporting    - - - -
celestegw@gmail.com

1   deposits increased, you know, 146,000.  So we had

2   comfortability now that the point of sale system

3   seemed to be capturing all the sales and clearly the

4   cash that was sitting outside is being deposited and

5   all the expenses so that you wouldn't get any more

6   personal liability and the onus was left in the

7   corporation which is where it belonged.  That was my

8   ultimate goal which this was the first thing that

9   started to confirm it.

10       Q.     And in basically your position on July

11  21st, 2014 to Judge Velazquez is that the main

12  concern, quoting from your summary, "The main concern

13  of this report is the plan to address the potential

14  liability of 523,498 that arose from unreported sales

15  and payroll of the corporation under the control of

16  Mr. Hernandez," correct?

17       A.     Yes.

18       Q.     Is there anything else you want to add

19  to that?

20       A.     Just that they were still -- and I

21  understand it's a cash-related business, but I

22  wanted -- I would work with Nora on getting like

23  procedures, like if you're going to go buy something

24  in cash, I wanted someone signing off on it so I

25  could keep a log.  Because the IRS likes a

Petrucelli - Direct                                    470

1    contemporaneous log.  So if we did go purchase meat

2    that day, it would match to that day.  Because it was

3    not really clear inventory.  So just little

4    suggestions like that; just keep a log, send so and

5    so to the store, we're having pork chops for lunch,

6    you know, and it would make sense that the receipt

7    would match the point of sale system.  So you had

8    some logical basis while cash wouldn't -- is done and

9    I understand why, you'd want to be able to say how

10   did they know you didn't buy the pork chops and take

11   them home for dinner.

12           So I wanted to have a contemporaneous

13   log and I started working with Nora, just have them

14   sign why they're going to store and what the purpose

15   is so if someone says it seems like a lot of cash

16   purchases I said yes, look at the point of sales, we

17   sold pork chops.  So I would be able to defend them

18   if it came about.

19       Q.    I direct your attention to P-30 now in

20   evidence.

21       A.    Okay.

22       Q.    The last page, is that your

23   signature -- not the last page, excuse me.  It's --

24       A.    Yeah, I don't see my signature on this

25   one.

Celeste Galbo Reporting    - - - -
celestegw@gmail.com

1        Q.      Do you recognize this document?

2        A.      Yeah, this was July.  I remember going

3    in July.

4        Q.      So P-30 is your report of September 5,

5    2014 to Judge Velazquez, correct?

6        A.      Correct.

7        Q.      And, again, the first page is the

8    previous summary and findings?

9        A.      Yes.

10       Q.      What is new now in this report?  Page 2

11   is the same?

12       A.      Yes, if you go to the accounting --

13       Q.      What page are you on?

14       A.      I'm on page 3.

15       Q.      Page 3.

16       A.      The point of sale system, not only do

17   we have the deposits, we had the point of sales

18   matching the ST 51 that was the sales tax file.  So

19   we now have point of sales matching the ST sales

20   which is really what you want.  Otherwise it was like

21   trying to figure it out.  So now I knew everything

22   was going through the point of sale system.

23       Q.      Okay.

24       A.      Including, including parties,

25   everything.  We actually were able to reconcile

1  deposits, everything at that point for the first

2  time.

3          Q.    So for the first time in your tenure on

4  September 5, 2014 appear to be in order

5  financially --

6          A.    Yes.

7          Q.    -- appear to be accounting-wise

8  undertaken within the scope of the accounting

9  parameters required by the state and by the federal

10  government, correct?

11          A.    Yes.  I mean, we would get the $27

12  difference.  It would be nice to get to that point as

13  opposed to thousands.

14          Q.    And a $27 difference the IRS didn't

15  really care?

16          A.    No, it's negligible.  27 could be a

17  transposition error divided by nine.  So it's

18  something that for the most part everything was

19  perfect.

20          Q.    On track?

21          A.    On track.

22          Q.    On page 4 of your summary, though,

23  again, it's basically a verbatim of the prior report

24  to Judge Velazquez.  The third sentence "The main

25  concern at this time of this report continues to be

1    the plan to address the potential liability of

2    $523,498 that arose from the unreported sales and

3    payroll of Marinero Grill under the control of Abel

4    Hernandez," correct?

5         A.    Yes, because we still hadn't

6    technically filed the returns and it was still out

7    there.

8         Q.    I direct your attention to P-31.

9         A.    Okay.

10        Q.    P-31 on page 7, is that your signature?

11        A.    Yes.

12        Q.    P-31 is your report of November 14,

13   2014, but now you are no longer before Judge

14   Velazquez, you're before His Honor, Judge Olivieri,

15   correct?

16        A.    That's correct.

17        Q.    Did you change anything in the scope of

18   your duties from Judge Velazquez to Judge Olivieri as

19   a mediator and then as the arbitrator?

20        A.    The only change was now to focus on the

21   contributions by both parties.

22        Q.    Okay.

23        A.    But I was still charged with making

24   sure that no further mitigation with the taxes, but

25   now I was charged with a new thing was to try to

Petrucelli - Direct                                474

1    determine who put what in.

2          Q.       Okay.  And on page 2 of the report to

3    Judge Olivieri we show findings of unreported sales

4    tax again.  What does page 2 tell us?

5          A.       Page 2 tell us where we are and then

6    Baroquin began to update his numbers and where he was

7    at.  So he had a total liability of 142,719 largely

8    because he wasn't addressing the corporate return.

9    But payroll he, I think he must have done some kind

10   of adjustment.  That was one question I asked him, I

11   said "How did you come up with the 96?"  But the main

12   difference between his number and my number remained.

13   My concern was that there was corporate dollars

14   removed from an entity which triggers the real

15   concern to me was the personal liability.  You know,

16   I kept saying to him it's going to be perfect, but

17   yeah, no, it's double, it's corporate and personal.

18         Q.       And you tell that to Judge Olivieri in

19   the first paragraph and you tell him again that it's

20   in the bold print, "This potential liability has not

21   been fully addressed as of the date of this report."

22   Correct?

23         A.       Correct.

24         Q.       And then we go again, you analyzed the

25   Baroquin report, correct?

Celeste Galbo Reporting     - - - -
celestegw@gmail.com

1        A.      Yes.

2        Q.      And?

3        A.      Again, he seemed to be addressing and

4    focusing on the sales tax and the payroll which I was

5    happy about because those are trust funds, but he

6    seemed not to get it as far as the personal side.

7    But I was pleased that at least the payroll and sales

8    tax exposure was satisfied.

9        Q.      Okay.  Then you go down on the

10   reconciliation of cash deposits to the point of sale.

11   What happened there?

12       A.      You know, I was pleasantly surprised

13   that I could account for, with the exception of 3,529

14   of 271,000, you know, given the magnitude of money

15   being outside money and inside money, I thought that

16   was, you know, a tolerable level considering I'm not

17   there -- I'm only there for a couple of hours.  So I

18   was very pleased that I could reconcile cash with the

19   books and the point of sale system which to me is my

20   ultimate goal.

21       Q.      So on November 14, 2014, going back to

22   September for that September, October, November,

23   almost three months, the business is run, being run

24   the way it should have been from the beginning,

25   correct?